UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JEFFERY M. NEWMAN,<br><br>Defendant.<br>_____/ | Case No. 3:10-mj-00015-CMK<br><br><br>MEMORANDUM OF<br>OPINION AND JUDGMENT |

    This case came on regularly for trial on January 12, 2011, at the United States District Court in Redding, California, the Honorable Craig M. Kellison, United States Magistrate Judge, presiding; the United States appeared by and through Matthew C. Stegman, Assistant United States Attorney; Robert D. Sweetin, Certified Law Clerk; Michael Weeble, Certified Law Student; and the defendant, Jeffery M. Newman, appeared by and through appointed counsel, Adam Ryan.

    The defendant is charged with violating 36 C.F.R. 261.3(a) "[i]nterfer[ing]. [t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty".

    The citation stems from the defendant's actions when meeting with a Forest Service Law Enforcement Officer at his private residence concerning alleged unauthorized special use activity on the Lassen National Forest.

    On routine patrol, Law Enforcement Officer Paul Zohovetz [Zohovetz] of the Lassen

1  National Forest observed a sign offering cross-country ski tuning services at a snowpark within the
2  Lassen National Forest.  The paper sign was affixed to a larger plywood sign that was placed
3  between two live trees.  The view of the sign had been enhanced by the removal of several of the
4  lower branches from the supporting trees.

5        Zohovetz latter called the phone number appearing on the sign and determined that the
6  individual offering the ski tuning services was the defendant Jeffery M. Newman [Newman].
7  Newman volunteered that he was affiliated with a group that maintained trails at the snowpark.

8        Any placement of commercial signage within forest service boundaries generally requires
9  special use authorization.  36 C.F.R. §§ 251.50, et seq.  Similarly, the attachment of the plywood
10 sign to live trees and the removal of branches would possibly constitute separate resource violations
11 under the forest service Code of Regulations.  See,  36 C.F.R. § 261.9.

12       While investigating these possible violations, Zohovetz again telephoned Newman requesting
13 his physical address to further discuss the nature of the ski tuning services.   During neither of his
14 telephonic conversations with Newman did Zohovetz reveal that he was a forest service law
15 enforcement officer, or that the purpose of the calls was to investigate possible forest service
16 violations.

17       As a result of  Zohovetz's second telephone call to Newman, he was able to arrange a
18 meeting on February 3, 2010 at Newman's residence in Chico, California.  Zohovetz arrived at
19 Newman's residence driving an authorized forest service vehicle clearly marked with lights and
20 appropriate signage.  Zohovetz was also wearing a forest service uniform. Upon arriving, Zohovetz
21 found Newman at the side of the residence.  Zohovetz identified himself and shook hands with
22 Newman.  Newman identified himself as Jeff.

23       Zohovetz began questioning Newman regarding his ski tuning services and the placement
24 of the sign at the snowpark.  When questioned about who constructed the sign, Newman indicated
25 that "Larry and I did."  Zohovetz then asked Newman for his identification, a point in time that all
26 parties agree that the situation began to deteriorate.

27       Since the sequence of the subsequent events is crucial to the government's argument that
28 Newman actions constitute a violation of § 261.3(a), the court will center on the sequence of events

as described by Zohovetz.

Zohovetz testified that when he asked Newman for his identification, Newman became "more resistant." When asked for his identification, Newman responded by saying "you're trespassing and get off my property." Zohovetz claims that Newman became "more agitated," and again demanded that Zohovetz get off of his property. Zohovetz next testified that Newman then began to crouch, "staggered his stance and affixed his eyes on him." Newman apparently again demanded that Zohovetz get off of his property. Both on cross examination and redirect, Zohovetz testified that Newman negatively reacted to the request for identification by blading his body in a threatening, crouching position with both fist clenched. Zohovetz maintains that at this point he became concerned for his personal safety and drew his taser and ordered Newman to get on his knees and place his hands behind his back. Newman, instead rose and fled from the driveway and entered his home through a side door.

Zohovetz then returned to his vehicle and called for backup law enforcement assistance. During this same period of time, Zohovetz also telephoned his immediate supervisor, Michael Zunino [Zunino], to discuss the ongoing situation. While Zohovetz discussed the situation with Zunino, Newman exited his residence carrying a cell phone and ran toward Zohovetz yelling that "Larry was coming."[1] Zohovetz testified that when he first observed Newman running towards him, he was unsure whether Newman was carrying some type of weapon. Zohovetz ordered Newman to stop and noticed that Newman was only carrying a cell phone. Newman then stopped and again returned to his residence.

As Zohovetz discussed the situation with Zunino, Newman telephoned Zohovetz on Zohovetz's cell phone yelling that "you are a liar, I'm going to nail you motherfucker." At trial, Zunino testified that he was also able to hear Newman's statements. Chico police eventually arrived along with Newman's associate, Larry, and the situation was eventually defused. Newman voluntarily came out of his residence and was latter cited and released.

---

[1] Larry is apparently the name of Newman's associate or partner in either the ski tuning enterprise, or a friend/volunteer in the Yahi Sierra Group. Newman also testified that Larry may have been involved in the construction of the plywood sign in issue.

Newman's version of the incident differs little from that of Gohovetz. He claims that during both of his telephone conversations, Zohovetz pretended to be an outdoor enthusiast seeking cross country skiing and ski tuning information. During the second call, Zohovetz arranged to meet with Newman in Chico at his residence on the pretense that he would be dropping off cross country skis for tuning services.

When Zohovetz approached Newman in the driveway of the residence, Newman realized that he had been "played" and immediately ordered Zohovetz off of his property. Although, Newman had a large "No Trespassing" sign attached to his residence, the court received no evidence that Zohovetz ever saw or was aware of the sign during his contact with the defendant.

Newman did not refute that he failed to respond to Zohovetz request for identification, but instead claims that once he realized that he had been duped, he notified Zohovetz that he needed to have his associate, Larry, come to the house, and then ordered Zohovetz to get off his property. Newman confirmed that during this contact he did clench his fists and latter ran into his house.

## DISCUSSION

For purposes of 36 C.F.R. § 261.3(a), a forest officer is performing an 'official duty' when the officer is on duty and performing an act that contributes to the protection, improvement, or administration of the National Forest." United States v. Willfong, 274 F.3d 1297, 1300 (9th Cir.2001) (citing United States v. Ryberg, 43 F.3d 1332, 1334 (9th Cir.1995)). Here, it is clear that Zohovetz was performing an "official duty" during his contact with the defendant while investigating the unauthorized special use activity on the Lassen National Forest.

In Willfong the Ninth Circuit held, over a strong dissent, that the defendant's failure to obey a forest officer's order constituted "interference" with the officer as a matter of law, and that defendant's failure to use physical force to do so was irrelevant. Willfong, supra at 1301-1302. As in the present case, the regulation in question was 36 C.F.R. § 261.3(a), and the order in question in Willfong was an order to desist logging operations on Forest Service Land. Defendant politely refused to shut down his operations under threat of arrest, and after his arrest, he told his crew to continue working. The Willfong court cited several state law cases for the proposition that failure to obey an order was sufficient to rise to the level of "interference." See State v. Boone, 243 Ga.

416, 254 S.E.2d 367 (1979), cert. denied, 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979) (refusal to obey order to vacate building constitutes interference); Ratliff v. State, 133 Ga.App. 256, 211 S.E.2d 192 (1974) (refusal to obey order to stop attempting to enter a premises being searched constitutes interference); City of Chicago v. Lynd, 47 Ill.2d 205, 265 N.E.2d 116 (1970), cert. denied, 402 U.S. 923, 91 S.Ct. 1383, 28 L.Ed.2d 662 (1971) (refusal to obey order to clear the street constitutes interference); State v. Manning, 146 N.J.Super. 589, 370 A.2d 499 (App.Div.1977) (refusal to obey order to re-enter vehicle constitutes interference); Township of East Brunswick v. Malfitano, 108 N.J.Super. 244, 260 A.2d 862 (App.Div.1970) (refusal to obey order to provide one's name and address constitutes interference). In discussing a separate regulation concerning public lands (36 C.F.R. § 261.3), the Ninth Circuit consulted Webster's New World Dictionary to defined "interfere" as to "oppose, intervene, hinder, or prevent." Willfong, supra at 1301.

At first blush, the court is tempted to find that Newman's defiant actions did interfere with Zohovetz's investigation and were unwarranted under the circumstances. Attempting to define what specific actions or events during the contact constitute a violation of § 261.3(a), however, is problematic.

The government argues that the elements of the offense were established during the period of time between Zohovetz's request that Newman provide identification to the point in time when Newman telephoned Zohovetz yelling "you are a liar, I'm going to nail you motherfucker." The court will hereinafter refer to this period of time as simply the "contact." The government claims that the violation occurred during each of three separate time frames. The first, being when Newman refused to provide identification, assumed a threatening, crouching position, and latter ran into his residence. The second, being when Newman ran from his residence carrying a cell phone towards Zohovetz yelling "Larry is coming." The third, being Newman's telephonic threat to Zohovetz that "you are a liar, I'm going to nail you motherfucker." In its post trial brief, the government also suggests that the totality of Newman's actions during the contact were sufficient to constitute a violation of 36 C.F.R. § 261.3(a).

The Supreme Court has noted that law enforcement officers do not violate the Fourth Amendment merely by approaching a person and asking questions. See Florida v. Royer, 460 U.S.

5

491, 497 (1983). The test of whether interaction between police and a citizen constitutes a seizure is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). For a mere encounter to be considered a seizure, a substantial showing of force or authority is required. See id.; see also I.N.S. v. Delgado, 466 U.S. 210, 215-16 (1984) (holding that unless the encounter is so intimidating that a reasonable person would think he was not free to leave without answering the agent's questions, there is no detention under the Fourth Amendment).

In the present case, it was proper for Officer Zohovetz to telephone and approach Newman at his residence with respect to his ongoing investigation. A law enforcement officer is permitted to investigate possible criminal behavior or activity even though there is no showing that probable cause to make an arrest of the individual was then extant. Florida v. Royer, supra at 497. This is normally referred to as having probable cause to investigate or probable cause to make a "Terry stop". See, for example, Brown v. Texas, 443 U.S. 47, 51 (1979); Terry v. Ohio, 392 U.S. 1 (1968). However, the inarticulate hunch, suspicion, or good faith of an arresting officer is insufficient to constitute probable cause to arrest. Brown v. Texas, supra. Thus, even though the law gives to law enforcement officers the right to make an investigatory stop of an individual, this right is conditioned that at that time the officer must have "probable cause to investigate", which exists only where the circumstances indicate that the particular person either has committed or is preparing to commit a crime. Therefore, in order to justify temporarily detaining a person for the purpose of conducting a criminal investigation, where the officer does not have probable cause to make a warrantless arrest, he must still have specific articulable facts which, in light of his experience and personal knowledge, together with other inferences from those facts, would reasonably warrant the intrusion on the freedom of the citizen. See generally, United States v. Brignoni-Ponce, 422 U.S. 873, 880-881 (1975).

Furthermore, law enforcement officers are justified to enter private property to conduct interviews and investigations, and no warrant is required. United States v. Hammett, 236 F.3d 1054, 1059 (9th Cir.2001) ("Law enforcement officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants.") (citing Davis v. United States, 327 F.2d 301 (9th

Cir.1964), United States v. Hersh, 464 F.2d 228, 230 (9th Cir.1972), United States v. Garcia, 997 F.2d 1273, 1279 (9th Cir.1993)); cf. United States v. Bradshaw, 490 F.2d 1097, 1100 (4th Cir. 1974) (recognizing that law enforcement officers "were clearly entitled to go onto defendant's premises in order to question him"). In United States v. Hersh, at 230 (quoting Davis v. United States, 327 F.2d 301, 303 (9th Cir.1964)) the court emphasized that:

> "Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law."

The right to enter private property to conduct criminal investigations, however, is not absolute. As the court noted in United States v. Davis, 327 F.2d at 303, the right extends only in the absence of "express orders from the person in possession against any possible trespass . . . ." An intrusion into a private residence without a warrant issued upon probable cause or exigent circumstances is presumptively unreasonable. Payton v. New York, 445 U.S. 573, 589-90 (1980). While it can be unclear whether a particular portion of the homeowner's property is part of the curtilage, Newman's driveway would be considered as such. United States v. Pineda-Moreno, 591 F.3d 1212, 1214-15 (9th Cir.2010).

Zohovetz testified that when the questioning of Newman centered on the request for identification, that Newman ordered Zohovetz to leave on at least three occasions. During cross examination, Zohovetz conceded that these demands were made by Newman before Zohovetz found it necessary to draw his taser.

The government contends that Zohovetz had probable cause to arrest Newman for the violations involved in the underlying investigation. For various reasons, the court does not agree.

Zohovetz testified that as a result of his observations at the snowpark, he decided to contact staff of the Lassen National Forest to determine whether the signage was permitted. The court did not receive any evidence that the signage was improper because defense counsel objected on the basis of hearsay. The objection was sustained. The government presented no other evidence that Zohovetz was aware at the time of contact that the signage was not authorized.

Zohovetz further testified that his purpose in meeting with Newman was to obtain information to complete his incident report. He testified that he did not go to Newman's residence to either arrest him or to even issue a violation notice. On cross examination, Zohovetz conceded that the purpose of his visit with Newman was to give him a "warning notice."[2] and to obtain "more specific information to take back to the office."

The evidence simply does not support that Zohovetz had "probable cause" to arrest Newman either for the special use or resource violations at any time during the contact. Zohovetz did not ask Newman any questions regarding damage to the trees, and as stated above, the court received no evidence that the signage was unauthorized. Although Newman volunteered that he and Larry had constructed the sign, the court is unclear whether this admission was in reference to the construction of the wood sign, its placement at the snowpark, or affixing the paper advertisement thereto. This lack of evidence coupled with Zohovetz's admission that he had no intention of citing Newman during the contact does not support probable cause.

It is also important to note that, even if there was probable cause to believe that Newman committed either the special use or resource violations, no arrest would have been permissible without a warrant because an law enforcement officer does not have authority to arrest without a warrant unless a misdemeanor is committed in his presence. Atwater v. City of Lago Vista, 532 U.S. 318 (2001); Brooks v. City of Seattle, 599 F.3d 1018 (9th Cir. 2010). The court also expresses pause in the manner Zohovetz advanced this situation to deteriorate to such a degree in the context of such minor alleged violations. See, Welsh v. Wisconsin, 466 U.S. 740, 753(1984).

Since Zohovetz did not have probable cause to arrest Newman for either the resource damage or special use activity, he had no right to remain on Newman's property once he was ordered to leave. The reasonableness of the law enforcement officer's need to detain an individual for questioning must be balanced against the defendant's Fourth Amendment rights. Every individual

---

[2] It is unclear what type of "warning notice" Zohovetz contemplated since he admits that he was only obtaining more information to take back to the office. Customarily, minor special use violations are resolved either informally, or by the exchange of correspondence. To this extent, the court finds it somewhat contradictory that Zohovetz intended to issue a "warning notice" to Newman on the day of the contact, and yet collect further information for review and possible action. It is also unclear whether Zohovetz intended the "warning notice" to be written or verbal.

has a constitutional right to be free from arbitrary or unreasonable stops by law enforcement. See, e.g., United States v. Brignoni-Ponce, supra at 878. The detention of Newman became unreasonable when Zohovetz was ordered to leave. By the time that Newman allegedly "postured" or "bladed" himself in a threatening manner, Zohovetz had been ordered to leave on three separate occasions.

Although Zohovetz's refusal to leave Newman's property after several demands and his resolve to complete his interview on his own terms might be considered laudable under the circumstances, it also reinforces the conclusion that Zohovetz did not feel that he was obligated to leave, or conversely that Newman was free to terminate their conversation. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, supra at 554. Similarly, Newman's refusal to comply with Zohovetz's request to provide identification does not constitute interference. The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state. See Houston v. Hill, 482 U.S. 451, 461-63 (1987).

Notwithstanding Zohovetz's refusal to leave Newman's property, there was also no evidence that Newman ever advanced upon Zohovetz once the taser was drawn. Although the evidence confirms that Newman crouched and clenched his fist, there is simply no evidence of further aggression. To some degree, the court finds that these actions or reactions by Newman understandable under the circumstances since Zohovetz refused to leave after numerous requests. The court also does not equate Zohovetz's request for identification and Newman's refusal to do so as the type of order disobeyed in United States v. Willfong. supra at 1301. Unlike the order made in Willfong, Zohovetz's right to make a "lawful order" had expired once he was ordered from the property.

The court also does not construe Newman approach down the driveway carrying a cell phone announcing that "Larry is coming" as an incident arising to a violation of § 261.3(a). By this point of the contact, Zohovetz had been ordered to leave on three separate occasions, and the court is unsure why Zohovetz remained at or near the residence. The evidence was also insufficient to

support that Newman's actions in running toward Zohovetz is tantamount to interfering, threatening, resisting or intimidating with Zohovetz's duties. See Houston v. Hill, supra at 461-63.

The court also finds unpersuasive the assertion that Newman's statement to "nail" Zohovetz as a threat to his personal safety. The defense's assertion that the statement, more than likely, was in reference in seeking to have Zohovetz reprimanded for his deception in arranging the meeting, as opposed to a threat of personal injury is simply a more plausible explanation.

## CONCLUSION

The court finds that the defendant is not guilty of violating 36 C.F.R. 261.3(a) "[i]nterfer[ing]. [t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty".

DATED: March 9, 2011

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE